**POLLARD BEARINGS CORPORATION**

v.

**UNITED STATES.**

**C. D. 4461; Protest No. 70/61480–17287–70.**

United States Customs Court,
July 12, 1973.

Donohue & Shaw, New York City (Joseph F. Donohue and Aloysius P. Stedina, New York City, of counsel), for plaintiff.

Harlington Wood, Jr., Asst. Atty. Gen. (James Caffentzis and Andrew P. Vance, New York City, trial attys.), for defendant.

LANDIS, Judge:

This case involves the classification of articles imported from England in

March and April 1964 and March 1965. The entry documents filed at New York described the articles as fan and pump shaft bearing assemblies. The record establishes that the articles are known in the trade as integral shaft bearings.

Customs officials classified the bearings as parts of pumps for liquids, dutiable at 12 per centum ad valorem under TSUS (Tariff Schedules of the United States) item 660.90. Plaintiff's complaint alleges that the bearings are "more than" parts of pumps for liquids and should, therefore, be classified either as parts of piston-type engines, dutiable under TSUS item 660.52, or as parts of motor vehicles dutiable under TSUS item 692.25.[1] Items 660.52 and 692.25 both provide for a duty rate of only 8.5 per centum ad valorem.

Defendant, in its answer to the complaint, asserts that the bearings were properly classified as parts of pumps for liquids and if not, then, at the times of these importations, the bearings are of a kind more specifically described in item 680.35, as ball or roller bearings, than as parts of piston-type engines or parts of motor vehicles.

The item provisions here in dispute provide in pertinent part as follows:

*Classified under*:

Schedule 6.—*Metals and Metal Products*

Part 4.—Machinery and Mechanical Equipment

\* \* \* \* \* \* \*

Subpart A.—Boilers, Non-Electric Motors and Engines, and Other General Purpose Machinery

\* \* \* \* \* \* \*

660.90    Pumps for liquids, whether or not fitted with measuring devices; liquid elevators of bucket, chain, screw, band, and similar types; all the foregoing, whether operated by hand or by any kind of power unit, and parts thereof .............................. 12% ad val.

*Defendant's alternative claim*:[2]

Schedule 6.—*Metals and Metal Products*

Part 4.—Machinery and Mechanical Equipment

\* \* \* \* \* \* \*

Subpart J.—Parts of Machines

\* \* \* \* \* \* \*

680.35    Ball or roller bearings, and parts thereof ............................. 3.4¢ per lb. + 15% ad val.

---

1. At the time of these importations, the tariff law did not specifically provide for integral shaft bearings. Subsequent to these importations, in late 1965, Congress enacted the Technical Amendments Act of 1965, 79 Stat. 933, 940, to include a specific tariff provision for integral shaft bearings presently identified in the Tariff Schedules of the United States as item 680.33.

2. Defendant's alternative claim is a recognized tactic in defense of an erroneous classification. Herrmann & Jacobs, Inc. v. United States, 29 CCPA 279, C.A.D. 203 (1942) ; A. L. Erlanger Co., Inc. v. United States, 50 Cust.Ct. 74, 76, C.D. 2392 (1963), affirmed 51 CCPA 51, C.A.D. 836 (1964).

*Claimed under:*

Schedule 6.—*Metals and Metal Products*

Part 4.—Machinery and Mechanical Equipment

\*    \*    \*    \*    \*    \*    \*

Subpart A.—Boilers, Non-Electric
Motors and Engines,
and Other General
Purpose Machinery

\*    \*    \*    \*    \*    \*    \*

Internal combustion engines and parts
thereof:

\*    \*    \*    \*    \*    \*    \*

Parts:

\*    \*    \*    \*    \*    \*

Other parts:

660.52          Parts of piston-type
engines other than
compression-ignition
engines ............... 8.5% ad val.

*Plaintiff's alternative claim:*

Schedule 6.—*Metals and Metal Products*

Part 6.—Transportation Equipment

\*    \*    \*    \*    \*    \*    \*

Subpart B.—Motor Vehicles

\*    \*    \*    \*    \*    \*    \*

Chassis, bodies (including cabs), and
parts of \* \* \* motor vehicles:

\*    \*    \*    \*    \*    \*    \*

692.25          Other ....................... 8.5% ad val.

TSUS, in its General Headnotes and Rules of Interpretation, provides a rule for the classification of "parts" of articles as follows:

10. *General Interpretative Rules.* For the purposes of these schedules—

\*    \*    \*    \*    \*    \*

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

▉ Defendant's alternative claim under TSUS item 680.35 aside (which in view of the result I have reached it is unnecessary to consider), it is apparent that both sides concur in the view that the imported bearings are properly classifiable as parts of an article described in TSUS. The question that is then presented for decision is whether the imported bearings are parts of pumps for liquids, as classified by customs, or parts for piston-type engines or motor vehicles, as plaintiff claims. Where both sides profess that imported articles are "parts" of an article described in TSUS, this court has consistently held that "[a]s between competing provisions for 'parts' the one which provides for parts of *that article of which the importation is most immediately a part* is a 'specific provision.'" (Emphasis quot-

ed.) Castle & Cooke, Inc. v. United States, 68 Cust.Ct. 75, C.D. 4339 (1972).

■ The facts establish that the imported bearings in the manner of their use are a component for an article sold as an auto water pump, and that the water pump is bolted to the engine block of a motor vehicle to move water from the radiator to cool the engine. Quite clearly, therefore, insofar as a water pump and an engine block have common association in a motor vehicle, the imported bearings are most immediately components or parts of the water pump, rather than components or parts for the engine or components or parts for the motor vehicle. Korody-Colyer Corp. v. United States, 66 Cust.Ct. 337, C.D. 4212 (1971); American Express Company v. United States, 65 Cust.Ct. 343, C.D. 4100 (1970); C. F. Liebert v. United States, 60 Cust.Ct. 677, C.D. 3499, 287 F.Supp. 1008 (1968).

What remains to be considered is plaintiff's contention that the imported bearings are "more than" parts of water pumps because, as a matter of fact, they are designed and intended to perform coequal functions with the water pump component and, *inter alia,* fan component of a motor vehicle.

Relevant to plaintiff's "more than" theory, the following physical and testimonial facts are of record.[3]

The imported steel shaft bearings (exhibit 2),[4] which have a steel shaft approximately six inches long, are provided with a steel bearing collar upon which the shaft serves as an axis in spinning. Exhibit 3 is an article known in the motor trade as a water pump illustrating "quite clearly the manner in which the [imported] bearings are installed in the water pump as it is sold to the automotive trade." (R.16.) The

main visible components of exhibit 3 are: (1) a cast-iron housing with a neck of sorts and finger-like extensions for hose attachments and holes for bolting it to the engine block; (2) the shaft bearing which is pressed or inserted into the neck of the housing so that it is completely enclosed by the housing except at one end; (3) a circular disk called an impeller that is pressed on the shaft at the end which faces on the engine block; (4) a so-called fan hub with four holes that is pressed on the shaft end that protrudes from the neck of the housing. Exhibit 3, in the condition assembled, is sold to the automobile trade as a water pump ready to be attached to the engine block.

Exhibit 4 is a mock-up of the front end of a motor vehicle illustrating the manner in which a pulley with four holes (exhibit 5) is fitted on the fan hub that is pressed on the imported shaft; a fan with a neck and hub with four holes, all one piece, is positioned on the short end of the shaft that protrudes through the pulley so that it is properly aligned with the pulley in a fashion that the fan and pulley can be and are bolted through the four holes to the fan hub. The mock-up also illustrates additional pulley attachments to the crankshaft, air conditioner, air injection pump, generator, and power steering components of a motor vehicle. There are belts passing around the fan hub pulley (four belts on the illustrative exhibit) to the various other pulley connections; working off power that comes from the crankshaft.[5] The pulley belts transmit the power necessary to operate the various components including the imported integral pump shaft bearing which, as it spins, operates the water impeller and the fan.

Plaintiff's witnesses testified that the bearing incorporated in the pump is ro-

---

3. Two witnesses testified for plaintiff and one witness testified for defendant.

4. Exhibit 1 is a catalog of "Automobile Fan and Water Pump Spindle Bearings".

5. Exhibit 7 is an engine belt and pulley chart showing the manner in which the various pulley and belt attachments can be arranged should a purchaser of a motor vehicle opt

for one or more of the components requiring a pulley attachment. The generator, water pump and crankshaft pulleys are basic in all motor vehicles that have water-cooled engines.

Exhibit 8 is a sample of a shaft bearing used to support the fan in a motor vehicle with an air-cooled engine.

tated by the belts that pass from the crankshaft pulley to the pulley mounted on the fan hub of the bearing. In rotating, the bearing transmits power to the water pump impeller and also drives the fan. The bearing additionally takes the load created by the power that is transmitted to other components of a motor vehicle such as an air conditioner, air injection pump, generator, and power steering. Plaintiff's witnesses expressed the opinion that all those functions are coequal in a motor vehicle in which those auxiliary components are present.

Failures associated with integral shaft bearings, in the experience of the witnesses for both sides, involved the shaft being broken at the load-bearing fan hub and under stress of supporting the fan and taking the radial load arising from the various belt drives. To forestall such failures the shaft of the imported integral shaft bearings were designed and strengthened to accept the pulley-fan attachment and the increased loads created by the power transmitted to the other components, without breaking.

The water pump (exhibit 3) is sold as an auto water pump but, in the opinion of plaintiff's witnesses, it is not a complete pump until it is bolted to the engine block. That opinion brought them to conclude that exhibit 3 is less than a pump, but they also concluded that the imported bearings were more than part of a pump because the bearing functions as a support bracket for the fan and also drives the auxiliary components. The imported shaft bearings are sold to manufacturers of auto water pumps. A generator, water pump and crankshaft are basic components of all motor vehicles with water-cooled engines. Air conditioners, power steering and air injection pumps are optional equipment in motor vehicles. The water pump in a water-cooled engine functions continually but a fan clutch will stop the fan at certain speeds while the shaft bearing continues to spin the impeller of the pump.

Defendant's witness expressed the opinion that the primary function of the imported bearings was the water pump function because the fan clutch can cut the fan off and the components not associated with the pump can be powered directly off the crankshaft drive.

It is apparent that these imported shaft bearings are the evolutionary answer of the automotive industry to the problem of joining and operating optional equipment developed by engineers in connection with motor vehicles. The issue posed by plaintiff's "more than" theory is whether the imported shaft bearings are a part for a pump (auto water pump) for liquids eo nomine provided for in TSUS item 660.90, as classified, or something more than such a part, to wit, a combination article so as to be classifiable under TSUS item 660.-52 or 692.25 as plaintiff contends. This issue is similar to that considered by the court of appeals in United Carr Fastener Corporation v. United States, 54 CCPA 89, C.A.D. 913 (1967), and Trans-Atlantic Company v. United States, 60 CCPA ——, C.A.D.1088 (1973).

The merchandise in United Carr, invoiced as "TEE-NUTS", consisted of a threaded barrel with metal prongs designed to be driven into wood members to serve as fastening means. The "TEE NUTS" thus designed performed a nut function and the function previously performed by a washer when associated in use with a nut. The "TEE NUTS", classified under the eo nomine tariff provision for nuts of steel were claimed properly classifiable as manufactures of steel, not specially provided for. In making that claim, it was contended that the "TEE NUTS" were "more than" nuts because they possessed features substantially in excess of those within the common meaning of the term "nuts". The court of appeals in affirming the decision of this court overruling the claim of United Carr quoted and apparently adopted this court's analysis of the record testimony as follows:

* * * The fact that a function, previously performed by a washer, which at best is but auxiliary when

associated in use with a nut, was eliminated in this evolutionary process, contributed to the improvement of, rather than a change in identity of the article as a nut, in our opinion. And the further fact that the evolved "TEE NUT" took on the added character of immobility does not, in our opinion, militate against the article continuing to be a species of nut. According to some of the above noted definitions, shape (square or hexagonal) of a nut is a condition facilitating the manipulation of the article. And this condition of maneuverability was simply improved upon in the evolution of the "TEE NUT".

In *Trans-Atlantic,* it was claimed that a device, which was "a kind of hinge" and *eo nomine* classified under TSUS as a hinge, should be classified under the TSUS provision for door closers and parts thereof of base metal. *Trans-Atlantic* contended that although the device was concededly "a kind of hinge" it was "more than a hinge" because it also closed the door and was, therefore, "a kind of door closer". The device functioned to hang or hold a door in place and to close the door automatically. The court of appeals affirmed the judgment of this court which found that the device comported with the dictionary definition of "hinge" and was, therefore, properly classifiable within an *eo nomine* provision for hinges. The opinion written for the court of appeals washed out the *Trans-Atlantic* contention that the device was more than a hinge stating:

> \* \* \* Concededly, it is also more than a door closer which would, under appellant's argument, also remove it from a 646.95 classification. Appellant would, therefore, at most have only a dry run. Anyway, we think that the primary function of the imported article should govern classification. See E. Green & Son (New York), Inc. v. United States, 59 CCPA 31, 450 F.2d 1396, C.A.D. 1032 (1971); United Carr Fastener Corp.

v. United States, 54 CCPA 89, C.A.D. 913 (1967).

and adopted the views of the court below that:

> The spring hinges at bar were primarily designed and constructed to function as hinges. Classification on the basis of its auxiliary function \* \* \* would be tantamount to letting the tail wag the dog.

■ The factual situation in this case, relevant to plaintiff's theory that the imported integral shaft bearings are more than parts for auto water pumps, in my opinion, is not substantively distinguishable from the factual situations and contentions presented in *United Carr* and *Trans-Atlantic.* Based on the physical and testimonial factual evidence of record, I find that the imported integral shaft bearings are a component, primarily designed for an auto water pump and that without the integral shaft bearings there would be no auto water pump as such. While plaintiff's witnesses were of the opinion that the imported integral shaft bearings are designed to perform coequal functions in a motor vehicle, defendant's witness had a contrary opinion and the physical evidence which weighs greater established that the integral shaft bearings are primarily designed to serve as a component of an auto water pump. In the condition imported, the integral shaft bearings have, not two coequal functions, but one primary use or function, namely, as a component for an auto water pump. Indeed, the integral shaft bearings cannot function in any intended manner until first incorporated as a component of an auto water pump. The pulley-fan attachment and power load-bearing functions come into play only incidentally after the auto water pump is attached to the engine block of a motor vehicle.

Plaintiff's peripheral argument that the imported bearings are not parts of a pump, because the article assembled from the bearing and other components is not a complete pump until it is bolted to an engine block, if its substance were

not factually doubtful,[6] would not change the result. See, Fedtro, Inc. v. United States, 65 Cust.Ct. 35, 41, C.D. 4050 (1970). The imported bearings, as I have already stated, primarily function most immediately as a part of a pump which is attached to the engine block of a motor vehicle. TSUS item 660.90, the provision under which the bearings were classified and assessed, is a specific provision for "parts" of articles that are pumps for liquids (Tariff Classification Study, Seventh Supplemental Report, page 99). Upon the authority of *United Carr* and *Trans-Atlantic, supra,* the bearings, in my opinion, were properly classified under TSUS item 660.90, the *eo nomine* provision for pumps for liquids, and the parts thereof.

The claims for classification under TSUS items 660.52 and 692.25 are overruled. Judgment will enter accordingly.

---

6. See, e. g., 2 Encyclopaedia Britannica 870 (1970) in which an automobile cooling system is broken down into elements which are: channels cast into engine block, radiator, water pump, thermostat and fan.